City of Chicago, a Municipal Corporation, Petitioner-Appellant, v. Central Standard Life Insurance Company, et al., Defendants, F. W. Means and Company, Defendant-Appellee.

Gen. No. 50,639.

First District, First Division.

January 31, 1966.

Rehearing denied February 21, 1966.

Raymond F. Simon, Corporation Counsel, and Frank S. Righeimer, Special Assistant Corporation Counsel, of Chicago (Frank S. Righeimer and Donald M. Phares, of counsel), for petitioner-appellant.

Concannon, Dillon, Snook & Morton, of Chicago (William R. Dillon and John B. Dillon, of counsel), for defendant-appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a condemnation proceeding involving one of the parcels of land required for the Southwest Highway, part of the Comprehensive Superhighway System of the City of Chicago. The City appeals from the verdict and judgment because of trial errors and seeks a new trial.

The theory of the City is that "the jury arrived at an erroneous and excessive verdict as to the award for the

property taken and for damages to the remainder of defendant's property because of palpably erroneous rulings by the court and instructions given and refused by the court and because of prejudice induced against petitioner by the remarks and arguments of counsel for defendant and by the remarks of the court to the jury and to counsel for the petitioner and by the court's rulings. The trial was conducted in such an atmosphere of sympathy for the defendant and prejudice against the City of Chicago that the jury could not possibly bring in a fair verdict. . . . ."

The property being taken is part of the holding of defendant F. W. Means and Company. The business of Means and Company, operated under the name of Chicago Towel Company, is renting out and servicing (washing and cleaning) towels, uniforms and dust control materials.

The holding of Means is improved with a complex of seven buildings and subsidiary structures, lying on the west side of Wabash Avenue between East 25th Street and East 26th Street on the South Side of Chicago. The east boundary is 350 feet on Wabash Avenue, commencing 50 feet south of East 25th Street and extending south to the middle of the block. The west boundary is 400 feet, commencing at East 25th Street and extending south along the east line of a public alley between Wabash and State Street. There is 50 feet of frontage on East 25th Street, east and adjoining the public alley.

The entire land area is 65,745 square feet. The building floor space is 77,027 square feet, consisting of 23,520 square feet used for office space, 43,580 square feet for garage and truck repair space, and 9,927 square feet for loft and storage space. The area is zoned M–1–3, restricted manufacturing use, permitting processing uses, light manufacturing and automobile repair work.

In 1964, F. W. Means and Company was using the Wabash Avenue premises for (1) its general administrative offices, and (2) its "fleet operations"—servicing and re-

pairing the 1,300 trucks it used in its operations throughout the City of Chicago and the country. Its laundry plants were in other locations in Chicago, and in Indiana, Illinois, Kentucky, Ohio and Wisconsin. On April 3, 1964, Means and Company moved its administrative and personnel offices to 35 East Wacker Drive in Chicago, where it occupied 20,000 square feet. The land being taken will include all of buildings Nos. 1 and 4, one-half of building No. 2, and approximately 400 square feet of the rear of building No. 3. In sum, approximately one-third of the office space and one-third of the garage space will be taken.

In 1964, at the time the petition to condemn was filed, the Means holding at 25th Street and Wabash Avenue was in the midst of a system of city streets which gave access to all parts of the city, with main arteries to the Loop such as State Street, Wabash Avenue, Michigan Avenue, Indiana Avenue and South Parkway.

On the property acquired north of 25th Street, there is to be built part of the connecting link between the Southwest Expressway and Lake Shore Drive, primarily an east and west road at this point and depressed about 20 feet below present level. The Southwest Expressway will extend from Lake Shore Drive to LaGrange Road and a connection with Route 66, and connects with all other major city expressways.

At Wabash Avenue, north of the Means holding, there will be no bridge or viaduct over the depressed highway. Bridges will cross over the expressway at South State Street and at Michigan Avenue, one block west and east respectively. Part of the acquired Means holding will be used in the relocation of 25th Street, so as to provide an east service drive or road on the south side of the expressway at the grade level of the present East 25th Street. It will not be possible to go directly north on Wabash Avenue across the Southwest Expressway from any part of the remainder of the Means holding. After the completion of the expressway, a circuitous route

will be required for any north traffic to and from the Means premises.

The witnesses for the City included an architect and engineer and two valuation witnesses, Richard J. Leyden and William Kaplan. The witnesses for the defendant included an engineer and a contractor and valuation witnesses, Hoyt Thompson and Clifford Zoll.

All of the valuation witnesses testified that prior to the taking by the City, the highest and best use of defendant's property was the use to which it was being put—namely, the principal offices of a service company with a large fleet operation, in which its administrative offices could be housed and in which its major overhaul maintenance on its vehicles could be performed. The fair cash market value of the defendant's entire property for such use and the value of the part taken was in the opinion of the valuation witnesses as follows:

| For City | Value of Whole | Value of Part Taken |
|---|---|---|
| Richard J. Leyden | $325,000 | $83,300 |
| William Kaplan | 327,500 | 83,900 |
| For Defendant | | |
| Hoyt Thompson | $391.500 | $100,600 |
| Clifford Zoll | 380,000 | 102,000 |

The jury awarded a verdict of $90,000 for the part taken.

On the issue of damages to the remainder, the valuation witnesses testified as follows:

| For City | Damages to Remainder |
|---|---|
| Richard Leyden | $32,700 |
| William Kaplan | 32,700 |
| For Defendant | |
| Hoyt Thompson | $101,900 |
| Clifford Zoll | 128,000 |

340

The jury awarded a verdict of $65,000 for damages to defendant's remaining property.

■ Initially, the City contends that "the verdict of the jury was against the manifest weight of the evidence." In support of this contention, the City argues, "The jury awarded the defendant a total of $155,000 for part taken and damage to the remainder, although after the taking the defendant would still retain 302 feet of its 350 feet frontage on S. Wabash Avenue, 48,285 square feet of the total amount of 65,745 square feet of land in the total holding, and 57,283 square feet of building floor space out of an original building floor space of 77,027 square feet and although every part of the remainder would have direct access to S. Wabash Avenue and E. 25th Street, just as it had before the taking and it would be on the corner of Wabash and relocated E. 25th Street (the new service drive) whereas, the company's holding before the taking, commenced 50 feet south of E. 25th Street."

The City further asserts, "The whole complex was a most unnatural alliance of administrative offices of a large corporation coupled with garage space where 1,300 trucks were constantly being repaired—all separate and apart from the real business of the company which was its laundry plants, scattered over Chicago and adjacent states. Add to this the fact that this old complex of buildings was interconnected by door-size openings between adjoining buildings and by a roofed-in private alley and it becomes apparent that defendant's valuation of the whole at $380,000 to $391,500, of the part taken at $100,600 to $102,000 and of damages to the remainder at $101,900 and $128,000 was most unrealistic." The City also asserts, "There was no evidence that defendant's valuation witnesses had any knowledge of the area in which the Means property was located except their inspection of the area for purposes of testifying. Although

they testified to general appraisal experience in other cities and in the Chicago area, they did not testify to a single other appraisal made in the Wabash-25th Street area."

We think it unnecessary to review at length the qualifications of the valuation witnesses and the elements considered by them in arriving at their valuation opinions. The record shows that the evidence offered by both sides was extensive and sufficient to fully inform the jury on all issues of the case. The jury viewed the premises, and the verdict of $90,000 for the part taken is well within the range of the valuation testimony, being $6,700 in excess of the lowest value testified to for the City and $12,000 less than the highest value testified to for the defendant. We conclude the verdict of the jury *as to the value of the property taken* was not against the manifest weight of the evidence.

As to damages to the remainder, all witnesses agree that the taking of approximately one-half of building No. 2 (2510–12 S. Wabash) would necessitate the razing of the remainder of that building, since it could not be economically reconstructed. This would leave the north wall of building No. 3 to be rehabilitated. The razing of building No. 2 and the restoration and refacing of the north wall of building No. 3 are admittedly damages to the remainder. There were differences of opinion between the City's and the defendant's witnesses in three main areas: (1) the highest and best use after the taking; (2) whether portions of the remaining buildings should be torn down and rebuilt elsewhere or merely shored up; and (3) whether the dead-ending of Wabash was an element of damages to be considered by the jury. Of these three areas, we believe the determinative question is whether the dead-ending of Wabash should have been included in the elements considered by the valuation witnesses and the jury.

On this issue, the City contends that "the trial court erred in allowing the jury, over the objection of the petitioner, to consider as an element of damage to the remainder the alleged impairment of access caused by the closing of Wabash Avenue across the expressway."

Defendant's witness Thompson testified that in fixing damages to the remainder, the elements he took into consideration included the closing of Wabash Avenue and the reduction in rental value because of little demand for office space in a single office building in the area. On cross-examination, he said that "the dead-ending of Wabash Avenue as a result of the taking has an effect on the rental value," and he considered it a disadvantage to the remainder not to be able to go directly north on Wabash Avenue, but stated that he had not broken down the elements of damage and so could not say how much this factor amounted to dollarwise. He said, "I have not broken it down that specifically as to the amount of damage caused by the closing of Wabash Avenue. . . . It is very slight, very slight; not great. . . . I did not take it into consideration as much as other factors involved, such as the more limited highest and best use of this property after the taking. . . . I already said that the highest and best use, after taking, is as a fleet operation."

On cross-examination, defendant's witness Zoll stated he could not allocate damages because of the closing of Wabash Avenue. When asked how much the damage was to the market value of the property on the closing of Wabash Avenue, Zoll stated, "I don't think I can add anything to the elements I have already testified to," and later on he said he did not allocate any specific amount to any part of the damages but took all the items of damage together as a whole. When asked how much he took off market value because of the 20-foot depres-

343

sion of the expressway, he stated, "The same answer as to your previous question."

At the outset, in considering the question of impairment of access as an element of damage to the remainder, we agree with the City that the instant case is not "a cul-de-sac situation," and cases of that nature are not of determinative value here. The claim of defendant for damages to access, if any, must be grounded upon the premise that it will not be possible to go north uninterruptedly on Wabash Avenue after the improvement is constructed, because there will be no bridge over Wabash at the new expressway, and whether this travel interruption is a material impairment of access different in kind from that suffered by the general public and compensable.

We also agree with the City that the national and local construction of highway systems throughout the United States has increased the importance of "the question of awarding damages to property owners for claimed impairment of access resulting from the construction of such highways."

The City notes that the most recent Illinois decision involving a claim for compensation for loss of access is Department of Public Works & Bldgs. v. Mabee, 22 Ill 2d 202, 174 NE2d 801 (1961). That was a condemnation case where the State sought to acquire part of a gasoline station area for a highway improvement, which included the construction of an insurmountable median strip in the highway. The defendants claimed that the placing of the median strip materially impaired access to their property differing in kind from that sustained by the general public and to be considered as an element of damages to the remainder. The trial court allowed such evidence to be considered in reaching the value of the property not taken. In reversing, our Supreme Court said (p 205):

344

"The defendants also argue that their right of access has been damaged and that such damage is compensable. It is a well-established rule in this State that the right of access to an existing public street or highway is a valuable property right which cannot be taken away or materially impaired without just compensation. . . . This rule has been applied where a public improvement has completely . . . *or materially* . . . destroyed a property owner's means of access to the whole highway by raising or lowering the grade of the highway. The rule cannot be applied, however, where the property owner's free and direct access to the lane of traffic abutting on his property has not been taken or impaired. Once on the highway he is in the same position and subject to the same police-power regulations as every other member of the traveling public. . . . The inconvenience of a one-way traffic regulation may be greater in degree as to a person whose premises abut on the highway where such a regulation has been invoked, but this cannot be the basis for damages. . . .

"The trial court erred in instructing the jury that they might consider the reduced value of the defendants' property caused by the construction of the insurmountable medial divider and in permitting defendants' witnesses to testify to the reduced value of the property caused by the construction of the divider. The judgment is accordingly reversed and the cause remanded to the county court of Woodford County for a new trial." (Emphasis supplied.)

See, also, Ryan v. Rosenstone, 20 Ill2d 79, 169 NE2d 360 (1960), another median strip case.

In Hacker v. City of Joliet, 196 Ill App 415 (1915), where the City of Joliet dead-ended Collins Street by elevating railroad tracks, which forced the plaintiff to turn

west for a block to cross the tracks and then go back east for a block to return to Collins. In holding that plaintiff's claim for damages for impairment of access was not compensable, the court said (p 425):

"Collins Street is not turned into a blind court. Appellant still has free access not only to and from the street abutting its property and to the north, but also from that street directly south for foot passengers and directly south for vehicles excepting they must travel about two blocks further than heretofore. The inconvenience suffered by appellant in being compelled to travel this additional distance to reach that part of the city lying south of the improvement is of the same kind and character that is suffered by all people who desire to travel with vehicles in that direction, differing only in degree. . . . though the market value of appellant's property may have been diminished by the change in Collins Street, no legal cause of action accrued therefrom."

See, also, Illinois Malleable Iron Co. v. Commissioners of Lincoln Park, 263 Ill 446, 105 NE 336 (1914); and City of East St. Louis v. O'Flynn, 119 Ill 200, 10 NE 395 (1887).

In State Highway Commission v. Central Paving Co., 399 P2d 1019 (1965), it is said (pp 1021, 1022):

"That impediment consists only of the inconvenience in being forced to travel a longer distance in going to and from the throughway. The inconvenience resulting from travelling a more circuitous route is the same kind of inconvenience the general public suffers when there is a modification of certain traffic regulations on existing streets and highways. . . . Defendants are not entitled to recover compensation for a loss unless they can show that the type of loss is peculiar to those owning land as distinct from the loss suffered by the general public."

346

On this issue, defendant contends that material impairment of access is a proper element to be taken into consideration by a jury in computing damage to the remainder of property taken in condemnation or eminent domain proceedings. Authorities cited include Chapter 24, § 11–91–1, Ill Rev Stats 1963, to the effect that "when property is damaged by the vacation or closing of any street or alley, the damage shall be ascertained and paid as provided by law." Barnard v. City of Chicago, 270 Ill 27, 110 NE 412 (1915), where the court stated (p 30):

> "Owners of property bordering upon a street, in addition to the public right of travel which they enjoy in common with all citizens, have certain private rights incidental to their ownership of abutting property. Among these is the right of access to and egress from the property by way of the street, and this right cannot now be taken away *or materially impaired* without compensation to the extent of the damages suffered." (Emphasis supplied.)

See, also, Department of Public Works & Bldgs. v. Wolf, 414 Ill 386, 389, 111 NE2d 322 (1953), and Rigney v. City of Chicago, 102 Ill 64 (1882).

Defendant also cites Nichols on Eminent Domain, 3rd Ed, Vol 2, § 6.4442, pp 571, 572.:

> "There can be no doubt that the enjoyment of convenient access to the street is a right for interference with which without legal authority an action would lie at common law, and consequently it is a right which the owner enjoys in connection with his property and which gives it additional value, so that *the material impairment of such access* is a special damage differing in kind from that suffered by the general public. It is a ground for a claim for damages when the constitution or statutes of the state provide compensation when property is damaged for the public use." (Emphasis supplied.)

Considering all of the foregoing pronouncements, we believe the test to be used here is set forth in Department of Public Works & Bldgs. v. Mabee, 22 Ill2d 202, 174 NE2d 801, and our inquiry on this point should be focused on whether the new highway will "completely . . . or materially" impair defendant's "means of access to the whole highway by raising or lowering the grade of the highway."

The testimony shows that Wabash Avenue will be dead-ended at 25th Street, immediately north and adjacent to defendant's holding. The "cut" will be 20 feet deep, and traffic on Wabash will no longer flow directly to or from the city. The service drive (25th Street as relocated) along the northwesterly line of the remaining property leads east to traffic bridges across the highway, which will be available for use in a circuitous fashion for northbound Wabash Avenue traffic.

The authorities cited by the City on the question of impairment of access as an element of damage to the remainder indicate that this element cannot be the basis for damage and is not compensable where the property owner's free and direct access to the lane of traffic abutting on his property has not been taken or impaired, even though the abutter may be inconvenienced and the value of his land lessened.

However, we are not persuaded that this rule is determinative here. These cited authorities appear to be cases where the "right of access" element was asserted to be the principal element of damage. In the instant case the testimony of defendant's experts shows that although "impairment of right of access" was considered as an element of damage, it was not considered "as much as other factors involved."

Thompson testified, "I took into consideration in this damage to the remainder the loss of part of the property which cannot be economically restored; the cost of

demolition of the building (blue hatching); and the cost of the restoration of this building that is left. It will be necessary to reface the brick wall over this 40 foot two-story section; relocate the air-conditioning unit in the corner of the garage somewhere in the adjoining building. It will be necessary to relocate the electric service because it will now be outside of the building. It will be necessary to relocate the large meter in this building; the boiler in the building now adequate to service all of the area because of its size cannot be economically used for just the remaining buildings and therefore will have to be replaced; there is a lot of incidental work, such as plaster patching, etc., due to the change of the line of ducts for air-conditioning, the steam lines and electrical service, the outlets; the closing of Wabash Avenue; the reduction in rental value because of the little demand for office space in a single office building in the area; and that the 4,300 feet is adequate to service the remaining area as a fleet operation; that the Meter Building has to be destroyed because it has no use except to contain air-conditioning units and electrical service which have to be moved; the loss of a portion of private alley space; that the most reasonable and economical manner is to restore the building as told by Mr. Todd; based on my experience his costs are fair and reasonable."

Zoll testified that in considering the highest and best use of the remainder after taking, the elements he took into consideration included the size and shape of the property, the irregular line of the property, that part of it that would not be usable as improved property, that traffic on Wabash Avenue would no longer flow directly into or from the Loop, that there would be a service drive along the northwesterly line of the remaining property, and the directional flow of traffic thereon would be east, that Wabash Avenue would be closed, that the proposed improvement would be in a cut 20 feet deep, the reduction

349

in size of the property and the reduction of its intensive use would be limited in the geographical service area. He testified that in his opinion the highest and best use of the remainder after taking would be a use similar to its use before the taking, except on a restricted basis.

█ The verdict of $65,000 for damages to defendant's remaining property was $32,000 in excess of the City's testimony and $63,000 less than the highest amount of damages testified to by defendant's witnesses. As to the access element of damage being included in the elements given to the jury for use in its deliberations as to damages to the remainder, the jury was fully informed by the City's witnesses that they did not consider it an element, and the witnesses for defendant considered it to be slight and not as important as other factors involved. The verdict is within the range of the testimony, and the jury had the benefit of observing the witnesses as they testified and of viewing the premises.

█ It is our opinion that, considering this entire record, the introduction of evidence and the giving of instructions Nos. 8 and 9 on the element of "right of access" were not prejudicial error here, even though erroneous in the light of Department of Public Works & Bldgs. v. Mabee, 22 Ill2d 202, 174 NE2d 801.

Finally, the City contends that the court committed prejudicial error in numerous rulings, in the giving and refusal of instructions, the refusal to declare a mistrial because of the continued illness of the City's counsel, and that the City was denied a fair trial by the conduct of the defendant's counsel, the court's comments when making rulings and the court's general failure to restrain defendant's counsel.

We have examined the record in the light of these contentions and find no abuse of discretion or reversible error. The record demonstrates that this trial was not a model of trial or courtroom amenities. The remarks made in County Board School Trustees of Du Page County v.

Boram, 26 Ill2d 167, 186 NE2d 275 (1962), at page 173, are appropriate here:

"It would unduly lengthen this opinion to comment upon each of the great number of alleged erroneous and prejudicial rulings of the trial judge, which defendants say compounded the prejudice engendered by counsel for petitioner. This was a hard fought case with neither counsel giving any quarter. The trial judge was remarkably patient and his actions and rulings do not bear out the charge of prejudice. We are of the opinion that the case was fairly tried and that the verdict was not the result of passion or prejudice."

For the reasons given, the judgment is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.